UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF TEXAS

DALLAS DIVISION

| | | |
|---|---|---|
| IRVING FIREMEN'S RELIEF & RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated, | § § § § | Civil Action No. |
| Plaintiff, | § § | |
| vs. | § § | |
| SIGNET JEWELERS LIMITED, MARK S. LIGHT and MICHAEL BARNES, | § § § | |
| Defendants. | § § § | DEMAND FOR JURY TRIAL |

**COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**

Plaintiff individually and on behalf of all others similarly situated, by plaintiff's undersigned attorneys, for plaintiff's complaint against defendants, alleges the following based upon personal knowledge as to plaintiff and plaintiff's own acts and upon information and belief as to all other matters based on the investigation conducted by and through plaintiff's attorneys, which included, among other things, a review of U.S. Securities and Exchange Commission ("SEC") filings by Signet Jewelers Limited ("Signet" or the "Company"), Company press releases, newly released documents from pending arbitration proceedings, earning calls, analyst reports, and media reports about the Company.  Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## SUMMARY OF THE ACTION

1.      This is a securities fraud class action on behalf of all persons who purchased Signet common stock between August 29, 2013 and February 27, 2017, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 ("1934 Act").  These claims are asserted against Signet and certain of its officers who made materially false or misleading statements during the Class Period in press releases and filings with the SEC.

2.      Signet engages in the retail sale of diamond jewelry and watches in the United States, Canada, Puerto Rico, the United Kingdom, the Republic of Ireland, and the Channel Islands.  The Sterling Family of Jewelers ("Sterling") division, a subsidiary of Signet, operates stores in malls and off-mall locations under the brand names Kay Jewelers ("Kay"), Kay Jewelers Outlet, Jared The Galleria of Jewelry ("Jared") and numerous others.  Sterling operates approximately 1,540 stores.

3.      On February 26, 2017, the public gained access to 249 declarations signed under penalty of perjury by current and former Sterling employees who worked at 450 different stores in at least 37 different states nationwide (the "Declarations").  The Declarations, spanning over 1,300 pages of sworn testimony, paint a nauseating, and stunningly consistent, picture of a Company in which sexual harassment, including sexual assault, is not just tolerated but modeled at Company functions by top executives, starting with the Company's Chief Executive Officer ("CEO"),

defendant Mark S. Light ("Light").  These Declarations were submitted in a private arbitration against the Company's Sterling division in June 2013, but remained under seal until February 26, 2017.  In SEC filings and other public statements, Sterling has steadfastly denied and downplayed the allegations made by the plaintiffs in the arbitration.  Behind closed doors, however, "[f]or the most part Sterling has not sought to refute this evidence," wrote the arbitrator in an interim 2015 decision recently quoted by *The Washington Post*.

4.       On February 27, 2017, *The Washington Post* published a report (the "Report"), which revealed widespread allegations of sexual harassment made in the private arbitration that implicated Sterling's senior managers and executives, including defendant Light and other Company leaders.  Based on a review of the Declarations, the Report described accusations that female employees "were routinely groped, demeaned and urged to sexually cater to their bosses to stay employed."  The Report extensively quoted from the Declarations and included interviews with some of the alleged victims.  The Report also noted that the arbitration now encompasses a certified class of 69,000 women who are current or former employees of the Company.  The bombshell revelations contained in the Report quickly reverberated across national headlines and lit up social media across the country.

5.       As a result of the news revealed in the Report, published after trading closed on February 27, 2017, the price of Signet common stock plummeted $9.29 per share to close at $63.59 on February 28, 2017, a decline of nearly 13% on volume of 11.3 million shares.  As one analyst has observed, it was Signet's "biggest one-day drop in 8 years."

6.       Throughout the Class Period, defendants violated federal securities laws by disseminating false or misleading statements to the investing public about the true nature and severity of the allegations in the arbitration, which included sworn testimony of rampant sexual harassment, including sexual assault, implicating senior managers and executives.

7.      Defendants' Class Period conduct had its intended effect, with Signet's stock trading at artificially inflated prices during the Class Period, reaching a high of $150.94 per share on October 30, 2015.  After the above revelations seeped into the market, however, the price of the Company's common stock dropped nearly 58% from its Class Period high, causing economic harm and damages to plaintiff and class members.

## JURISDICTION AND VENUE

8.      The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the 1934 Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5, 17 C.F.R. §240.10b-5, promulgated thereunder by the SEC.

9.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the 1934 Act.

10.      Venue is proper in this District pursuant to §27 of the 1934 Act and 28 U.S.C. §1391(b).  Signet transacts business in this District, including through its retail locations in this District, and through its 414,000 square foot Corporate and Distribution facility in Irving, Texas. The Company has a total of 243 stores in Texas, the second most of any state in the U.S., after Florida (245 stores).  Also, many of the acts charged herein, including the preparation and/or dissemination of false or misleading information, occurred in substantial part in this District, and the plaintiff is located in this District.

11.      In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## THE PARTIES

12.      Plaintiff Irving Firemen's Relief & Retirement Fund purchased Signet common stock during the Class Period as set forth in the attached certification and was damaged thereby.

- 3 -

13.     Defendant Signet, a Bermuda corporation, is a retailer of jewelry, watches and associated services in the United States, Canada and the United Kingdom, among other countries. Signet's principal executive offices are located in Bermuda.  Signet's common stock trades on the NYSE under the ticker symbol "SIG."  Signet is the world's largest diamond jewelry retailer.  The Company's Sterling division operates over 1,500 retail stores across the country under the brand names Kay and Jared, among others.  Defendant Signet Jewelers Limited may be served at Clarendon House, 2 Church Street, Hamilton HM11, Bermuda, or wherever it may be found.

14.     Defendant Light has served as CEO and a director of Signet since November 1, 2014. Defendant Light was previously President and Chief Operating Officer ("COO") of Signet and CEO of the Sterling division since 2006.  Light's father, Nathan Light, was CEO of Sterling for 20 years until he resigned in 1995.  Light has held various senior leadership positions within Signet and its Sterling division for the past 25 years.  Defendant Mark S. Light may be served at 4820 Stone Gate Boulevard, Akron, OH 44333, or wherever he may be found.

15.     Defendant Michael Barnes ("Barnes") was CEO of Signet until his resignation effective October 31, 2014.  Defendant Barnes sold nearly $5 million worth of his Signet stock during the Class Period.  Defendant Michael Barnes may be served at 5008 Monterey Drive, Frisco, TX 75034, or wherever he may be found.

16.     The defendants referenced above in ¶¶14-15 are collectively referred to herein as the "Individual Defendants."  The Individual Defendants made, or caused to be made, false or misleading statements or material omissions that caused the price of Signet common stock to be artificially inflated during the Class Period.

17.     The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Signet's quarterly and annual reports, press releases and presentations to securities analysts, money and portfolio managers and institutional

investors, *i.e.*, the market.  They were provided with copies of the Company's reports and press releases alleged herein to be false or misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions with the Company, and their personal knowledge and/or access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were materially false or misleading.  The Individual Defendants are liable for the false or misleading statements pleaded herein.

**DEFENDANTS' FRAUDULENT SCHEME AND COURSE OF BUSINESS**

18.     Defendants are liable for making false or misleading statements, failing to disclose adverse facts known to them about Signet and its Sterling division, and/or making statements without a good-faith basis to do so.  Defendants' fraudulent scheme and course of business, which operated as a fraud or deceit on purchasers of Signet common stock was a success, as it deceived the investing public about:

(a)     the Company's illegal business practices and mismanagement of the same;

(b)     the nature and strength of the evidence being mounted against the Company in the arbitration proceedings;

(c)     the size of the class in the arbitration proceedings;

(d)     the reputational and brand risk posed by the evidence, including the Declarations;

(e)     the potential legal liability that the Company was facing;

(f)     the Company's financial condition; and/or

(g)     the operational costs required to remedy the Company's illegal practices and rehabilitate the Company's reputation.

19.     Defendants' fraudulent scheme and course of business artificially inflated the price of Signet common stock; permitted certain Signet executives to cash-in by selling stock at fraud-inflated prices; and/or caused plaintiff and other members of the Class (as defined below) to purchase Signet common stock at artificially inflated prices.

## DEFENDANTS' SCIENTER

20.     During the Class Period, defendants had the motive and opportunity to commit the alleged fraud. Defendants also had actual knowledge of the misleading statements they made and/or acted in reckless disregard of the truth at the time. In doing so, defendants participated in a scheme to defraud and committed acts and practices, and participated in a course of business that operated as a fraud or deceit on purchasers of Signet common stock during the Class Period.

## FACTUAL BACKGROUND

21.     Signet is a retailer of jewelry, watches, and associated services in the United States, Canada, Puerto Rico, the United Kingdom, the Republic of Ireland, and the Channel Islands. The Company's segments are the Sterling division, the UK Jewelry division, the Zale division, which consists of Zale Jewelry and Piercing Pagoda, and the Other segment. The Other segment includes subsidiaries involved in purchasing and conversion of rough diamonds to polished stones. The Company operates retail jewelry stores in various real estate formats, including mall-based, free-standing, strip center and outlet store locations. It operates approximately 3,620 stores and kiosks across approximately five million square feet of retail space. The Sterling division operates approximately 1,540 stores. Its stores operate nationally in malls and off-mall locations as Kay, and regionally under various mall-based brands. Zales brands include Zales Jewelers and Zales Outlet.

22.     On March 18, 2008, 15 current and former female employees filed a class action complaint in this District against Signet's Sterling division, styled *Jock, et al. v. Sterling Jewelers, Inc.*, No. 1:08-cv-02875-JSR (S.D.N.Y. filed Mar. 18, 2008). The *Jock* plaintiffs brought the class action "to challenge a pattern and practice of sex discrimination in promotion and compensation

committed against current and former female employees by Sterling Jewelers, Inc." *Id.*, Dkt. No. 1 at 1.  Plaintiffs alleged violations of Title VII of the Civil Rights Act ("Title VII") for disparate impact and disparate treatment, violations of the Equal Pay Act ("EPA"), and violations of the Age Discrimination in Employment Act on behalf of two named plaintiffs. *See id.* at 38-41.

23.    On June 18, 2008, the Honorable Jed S. Rakoff, District Judge, referred the *Jock* case to arbitration and stayed the litigation pending completion of the arbitration.  Thereafter, plaintiffs proceeded with their claims before the American Arbitration Association ("AAA") Employment and Class Action Tribunal, the Honorable Kathleen A. Roberts (Ret.), presiding.

24.    On June 21, 2013, plaintiffs submitted their motion for class certification in the arbitration.  Among the exhibits to their class certification motion were the Declarations submitted under seal by current and former female and male employees, spanning over 1,300 pages of evidence that included strikingly similar allegations of sexual harassment, including sexual assault. Approximately half of the Declarations, over 100 employees, provided sworn testimony about sexual misconduct implicating executives and top managers of the Company.  The Declarations were provided to the arbitrator and the defense, but they were not made available to the public until February 26, 2017.[1]

25.    The arbitration has largely been conducted in private and the Company has disclosed little about what went on in those proceedings over the past nine years.

**DEFENDANTS' MATERIALLY FALSE OR MISLEADING STATEMENTS DURING THE CLASS PERIOD**

26.    Just two months after the *Jock* plaintiffs submitted their motion for class certification in the private arbitration, including 1,300 pages of hundreds of sworn Declarations, Signet

---

[1]    Even now, the names of the alleged perpetrators remain redacted in the Declarations, with only the categorical position of the perpetrator, such as "Executive(s)," typed in red over the redacted text.  Moreover, the class certification brief, now available to the public in part, remains heavily redacted, including all seven pages that follow the heading, "Conduct of Executives."

announced its second quarter fiscal 2014 financial results.[2]   On August 29, 2013, the Company

issued a press release.   The press release quoted then CEO, defendant Barnes, as stating:   "Our

earnings per share of $0.84 were at the high-end of our guidance; excluding Ultra our earnings per

share were $0.90."

       27.     Also, on August 29, 2013, Signet filed its Form 10-Q with the SEC for the period

ending August 3, 2013, in which Signet represented:

> In March 2008, a group of private plaintiffs (the "Claimants") filed a class
> action lawsuit for an unspecified amount against Sterling Jewelers Inc. ("Sterling"), a
> subsidiary of Signet, in the U.S. District Court for the Southern District of New York
> alleging that US store-level employment practices are discriminatory as to
> compensation and promotional activities with respect to gender.   In June 2008, the
> District Court referred the matter to private arbitration where the Claimants sought to
> proceed on a class-wide basis.   In June 2009, the arbitrator ruled that the arbitration
> agreements allowed the Claimants to proceed on a class-wide basis and attempt to
> seek class certification.   Sterling challenged the ruling and the District Court vacated
> the arbitrator's decision in July 2010.   The Claimants appealed that order to the U.S.
> Court of Appeals for the Second Circuit.   In July 2011, the Second Circuit reversed
> the District Court's decision and instructed the District Court to confirm the
> Arbitrator's Award (i.e., to allow the Claimants to move forward with a proposed
> class claim in arbitration).   Sterling filed a petition for rehearing en banc of the
> Second Circuit panel's decision, which was denied on September 6, 2011.   Sterling
> filed a petition writ of certiorari with U.S. Supreme Court seeking review of the
> Second Circuit's decision, which was denied on March 19, 2012.   The arbitration
> proceeding has resumed.   The parties engaged in fact discovery related to class
> certification issues through March 15, 2013.   On June 21, 2013, pursuant to the
> briefing schedule ordered by the Arbitrator, the Claimants filed their motion for class
> certification, disclosed their experts, and produced their expert reports.   Sterling's
> response to Claimants' class certification motion, Sterling's disclosure of its experts
> and their reports, as well as any motions relating thereto are due on October 3, 2013.
> The Claimants' reply brief, any expert rebuttal submissions, as well as any motions
> relating thereto are due on December 20, 2013.   Expert discovery is ongoing, and all
> expert depositions must be completed by January 10, 2014.   The parties have
> proposed that a hearing on Claimants' motion for class certification be held during
> the week of January 20, 2014, or as soon thereafter as the Arbitrator's schedule
> permits.

*     *     *

> ***Sterling denies the allegations*** of both parties and has been defending these
> cases vigorously.   At this point, no outcome or amount of loss is able to be estimated.

       28.     On November 26, 2013, Signet issued a press release announcing its third quarter

fiscal 2014 financial results.   The press release quoted defendant Barnes as stating that the Company

---

[2]     Signet's fiscal year ends on Saturday nearest to January 31.

was "pleased with" the results and that the Company's "competitive strengths have us well-positioned for the fourth quarter."

29.     On March 27, 2014, Signet issued a press release announcing its fourth quarter and fiscal 2014 financial results.  The release quoted defendant Barnes as stating that the Company was "pleased with our progress in the current quarter-to-date and expect to achieve our goals for the first quarter" and that the "quarterly dividend demonstrates our belief in the strength of the business and our commitment to increase value for our shareholders."

30.     On March 27, 2014, Signet filed its Annual Report on Form 10-K with the SEC for the fiscal year ended February 1, 2014, and represented:

> In March 2008, private plaintiffs filed a class action lawsuit for an unspecified amount against Sterling Jewelers Inc. ("Sterling"), a subsidiary of Signet, in U.S. District Court for the Southern District of New York, which has been referred to private arbitration.  In September 2008, the US Equal Employment Opportunities Commission filed a lawsuit against Sterling in U.S. District Court for the Western District of New York.  ***Sterling denies the allegations*** from both parties and has been defending these cases vigorously.  If, however, it is unsuccessful in either defense, Sterling could be required to pay substantial damages.  At this point, no outcome or amount of loss is able to be estimated.

> *          *          *

> As previously reported, in March 2008, a group of private plaintiffs (the "Claimants") filed a class action lawsuit for an unspecified amount against Sterling Jewelers Inc. ("Sterling"), a subsidiary of Signet, in the U.S. District Court for the Southern District of New York alleging that US store-level employment practices are discriminatory as to compensation and promotional activities with respect to gender. In June 2008, the District Court referred the matter to private arbitration where the Claimants sought to proceed on a class-wide basis.

> Discovery has been completed.  The Claimants filed a motion for class certification and Sterling opposed the motion.  A hearing on the class certification motion was held in late February 2014.  The motion is now pending before the Arbitrator.

> *          *          *

> ***Sterling denies the allegations*** of both parties and has been defending these cases vigorously.  At this point, no outcome or amount of loss is able to be estimated.

31.     On May 22, 2014, Signet issued a press release announcing its first quarter fiscal 2015 financial results.  The release quoted defendant Barnes as stating in part:

> While we expect to end the quarter with mid single digit comps, our performance in the second quarter to date has actually been higher than that including a strong Mother's Day.  Our team's consistent ability to execute our initiatives by focusing on our competitive strengths leaves us well-positioned to achieve our objectives this year.

32.     On August 28, 2014, Signet issued a press release announcing its second quarter fiscal 2015 financial results.  The release quoted defendant Barnes as stating that the Company "delivered a very strong second quarter" and "our best operating margin in five years."

33.     On October 14, 2014, Signet issued a press release announcing appointment of defendant Light as the Company's new CEO.  The release stated in part:

> Todd Stitzer, Chairman said "We are delighted to announce Mark's promotion to Chief Executive Officer of Signet.  Mark is an experienced, strategic leader who has been deeply involved in the company's Vision 2020 Strategy, the Zale acquisition and its ongoing integration.  ***In addition he has a meticulous approach to operational details, and has been the main architect of our Sterling division's consistently profitable growth and has played a key role in defining and executing Signet's growth strategy***.  He has also been an advisor to our UK Managing Director since 2013 and became formally responsible for that business in mid-2014.  ***These valuable attributes have been developed during his long and successful career of over 30 years with Signet, and the Board of Directors is confident that Mark is the right person to lead the Company forward as Signet enhances its position as a leading retailer in the US, UK and Canada***."

34.     On November 25, 2014, Signet issued a press release announcing its third quarter fiscal 2015 financial results.  The release quoted defendant Light as stating: "The Sterling division delivered strong operating profit leading to adjusted earnings per share for Signet of $0.21, exceeding our guidance."

35.     On November 25, 2014, after releasing its third quarter fiscal 2015 financial results, Signet held a conference call for analysts, media representatives and investors, during which defendant Light represented the following: "We had a very successful and well-received managers leadership conference in the September/October time frame to kick off our fourth-quarter holiday preparations at the store level."

36.     On February 2, 2015, in the *Jock* private arbitration, Arbitrator Roberts granted, in part, the plaintiffs' motion for class certification.  The arbitrator observed that sworn testimony

included references to "soliciting sexual relations with women (sometimes as a quid pro quo for employment benefits), and creating an environment at often-mandatory Company events in which women are expected to undress publicly, accede to sexual overtures and refrain from complaining about the treatment to which they have been subjected." Yet, "[f]or the most part Sterling has not sought to refute this evidence." Instead, "Sterling argues that it is inadmissible, irrelevant and insufficient to establish a corporate culture that demeans women." Accordingly, Sterling's public denials of the allegations in the arbitration in its SEC filings and other public statements were false or, at the very least, rendered misleading by its contrary submissions in the arbitration proceedings.

37.     On March 26, 2015, Signet issued a press release announcing its fourth quarter and fiscal 2015 financial results. The release stated in pertinent part as follows:

> Mark Light , Chief Executive Officer of Signet, said, "We had an outstanding finish to another strong year of growth for Signet. . . . EPS of $2.84, and adjusted EPS of $3.06 – an increase of 40.4%. For the year, we generated . . . EPS of $4.75 and adjusted EPS of $5.63 – an increase of 23.5%.

> *       *       *

> He continued, "I want to congratulate and thank all Signet team members for a fantastic fiscal year and fourth quarter. Their dedication, passion, and collaboration delivered significant value for Signet shareholders and position our Company for growth in the future."

38.     On March 26, 2015, Signet filed its Annual Report on Form 10-K with the SEC for the fiscal year ended January 31, 2015, in which it represented:

> In March 2008, private plaintiffs filed a class action lawsuit for an unspecified amount against Sterling Jewelers Inc. ("Sterling"), a subsidiary of Signet, in US District Court for the Southern District of New York, which has been referred to private arbitration. In September 2008, the US Equal Employment Opportunities Commission filed a lawsuit against Sterling in US District Court for the Western District of New York. ***Sterling denies the allegations*** from both parties and has been defending these cases vigorously. If, however, it is unsuccessful in either defense, Sterling could be required to pay substantial damages. At this point, no outcome or amount of loss is able to be estimated.

> *       *       *

> As previously reported, in March 2008, a group of private plaintiffs (the "Claimants") filed a class action lawsuit for an unspecified amount against Sterling Jewelers Inc. ("SJI"), a subsidiary of Signet, in the US District Court for the Southern District of New York alleging that US store-level employment practices are

discriminatory as to compensation and promotional activities with respect to gender. In June 2008, the District Court referred the matter to private arbitration where the Claimants sought to proceed on a class-wide basis. The Claimants filed a motion for class certification and SJI opposed the motion. A hearing on the class certification motion was held in late February 2014. On February 2, 2015, the arbitrator issued a Class Determination Award in which she certified for a class-wide hearing Claimants' disparate impact declaratory and injunctive relief class claim under Title VII, with a class period of July 22, 2004 through date of trial for the Claimants' compensation claims and December 7, 2004 through date of trial for Claimants' promotion claims. The arbitrator otherwise denied Claimants' motion to certify a disparate treatment class alleged under Title VII, denied a disparate impact monetary damages class alleged under Title VII, and denied an opt-out monetary damages class under the Equal Pay Act. On February 9, 2015, Claimants filed an Emergency Motion To Restrict Communications With The Certified Class And For Corrective Notice. SJI filed its opposition to Claimants' emergency motion on February 17, 2015, and a hearing was held on February 18, 2015. Claimants' motion was granted in part and denied in part in an order issued on March 16, 2015. Claimants filed a Motion for Reconsideration Regarding Title VII Claims for Disparate Treatment in Compensation on February 11, 2015. SJI filed its opposition to Claimants' Motion for Reconsideration on March 4, 2015. Claimants' reply was filed on March 16, 2015. No hearing has been scheduled. Claimants filed Claimants' Motion for Conditional Certification of Claimants' Equal Pay Act Claims and Authorization of Notice on March 6, 2015. SJI's opposition is due on May 1, 2015 and Claimants' reply is due on May 15, 2015. SJI filed with the US District Court for the Southern District of New York a Motion to Vacate the Arbitrator's Class Certification Award on March 3, 2015. Claimants' opposition is due on March 23, 2015 and SJI's reply is due April 3, 2015. SJI's motion is scheduled for hearing on April 20, 2015.

*        *        *

**SJI denies the allegations** of both parties and has been defending these cases vigorously. At this point, no outcome or possible loss or range of losses, if any, arising from the litigation is able to be estimated.

39.     On May 28, 2015, Signet issued a press release announcing its first quarter fiscal

2016 financial results. The release stated in pertinent part as follows:

> Mark Light, Chief Executive Officer of Signet, said, "We delivered a very strong first quarter . . . a 25.6% increase in adjusted EPS. . . .

> "We continue to see favorable progress of our integration of the Zale division. . . . We expect this trend to continue, and we remain well-positioned to meet our goal of $150 million to $175 million in cumulative 3-year operating profit synergies by the end of January 2018."

> "I want to congratulate and thank all Signet team members for their contributions to our impressive first quarter results."

40.     On August 27, 2015, Signet issued a press release announcing its second quarter

fiscal 2016 financial results. The press release stated in pertinent part as follows:

Mark Light, Chief Executive Officer of Signet Jewelers, said, "Signet delivered a second quarter . . . earnings per share of $0.78, and adjusted earnings per share of $1.28, a 19.6% increase. These results exceeded our . . . adjusted EPS guidance for the quarter. Results were driven by strong and consistent sales growth across all of our selling channels, as well as solid profitability and disciplined cost management across our organization.

"The integration of Zale continues to go well, and we have begun to see the benefit of net synergies positively impact our operating results. I am increasingly confident that we are on track in FY16 to realize 20% of our three year net synergy target of $150 million to $175 million. . . .

"I want to congratulate and thank all Signet team members for their contributions to our quarterly results."

41.     On November 24, 2015, Signet issued a press release announcing its third quarter

fiscal 2016 financial results. The press release stated in pertinent part as follows:

"Signet delivered another quarter of continued growth, highlighted by . . . adjusted earnings per share growth of 57.1%," commented Mark Light, Chief Executive Officer of Signet Jewelers. . . . "We also delivered excellent earnings growth, although earnings were affected by a modest margin impact due to a sales mix shift from Jared to Kay."

\*          \*          \*

"The integration of Zale continues to go well, and we remain confident we will deliver $30 million to $35 million in net synergies this fiscal year. We remain committed to maintaining profitable growth while balancing investment back into the business with shareholder return.

"I want to thank all Signet team members for their contributions to our results and for their hard work in preparing for fourth quarter."

42.     On February 29, 2016, Signet issued a press release announcing its preliminary fourth

quarter fiscal 2016 results. The press release stated in pertinent part as follows:

"Signet delivered outstanding fourth quarter results exceeding the high end of our adjusted EPS guidance with year-over-year growth of 18.6% . . . ," said Mark Light, Chief Executive Officer of Signet Jewelers. . . . "We are pleased with our first quarter to date operating results and continue to see strength in the business including credit. . . . After having operated Zales for a full year we have identified a significant number of incremental synergy opportunities and are increasing our expectations for total synergies from $150 million - $175 million to $225 million - $250 million by the end of FY 2018 with a faster pace of synergy realization than previously guided."

Mr. Light continued, "Confidence in our business and the strength of our cash position enables us to maintain our capital allocation strategy that provides for meaningful returns to our shareholders. We see substantial value in our shares and our share repurchase program begins this week. Our team is doing an outstanding job of driving growth and delivering results."

43.     On March 24, 2016, Signet issued a press release announcing its fourth quarter and fiscal 2016 financial results.  The press release quoted defendant Light as stating that "Signet had an excellent finish to another strong year with annual sales of $6.55 billion and comp sales growth of 4.1%."  Defendant Light further stated in pertinent part:

> "As we start our new fiscal year, we are pleased with our progress quarter to date as indicated by the financial guidance we have provided.  In Fiscal 2017, we will continue our disciplined execution of our focused strategies that include our omni-channel approach to customer service; product innovation and fresh line extensions; and maximizing the effectiveness of marketing through the use of customer segmentation research.  All of these efforts combined with an accelerated pace of store openings give us confidence in achieving another year of significant EPS growth, as evidenced by our newly-initiated annual guidance.
>
> "I want to thank all Signet team members for their contributions to our results and for all their hard work in delivering the fourth quarter and Fiscal 2016."

44.     On March 24, 2016, Signet filed its Annual Report on Form 10-K with the SEC for the fiscal year ended January 30, 2016 and represented:

> Signet is involved in legal proceedings incidental to its business.  Litigation is inherently unpredictable.  Any claims against us, whether meritorious or not, could be time consuming, result in costly litigation, require significant amounts of management time and result in the diversion of significant operational resources.  In March 2008, private plaintiffs filed a class action lawsuit for an unspecified amount against Sterling Jewelers Inc. ("Sterling"), a subsidiary of Signet, in US District Court for the Southern District of New York, which has been referred to private arbitration.  In September 2008, the US Equal Employment Opportunities Commission filed a lawsuit against Sterling in US District Court for the Western District of New York.  *Sterling denies the allegations* from both parties and has been defending these cases vigorously.  If, however, it is unsuccessful in either defense, Sterling could be required to pay substantial damages.  At this point, no outcome or amount of loss is able to be estimated.

*     *     *

> As previously reported, in March 2008, a group of private plaintiffs (the "Claimants") filed a class action lawsuit for an unspecified amount against SJI, a subsidiary of Signet, in the US District Court for the Southern District of New York alleging that US store-level employment practices are discriminatory as to compensation and promotional activities with respect to gender.  In June 2008, the District Court referred the matter to private arbitration where the Claimants sought to proceed on a class-wide basis.  The Claimants filed a motion for class certification and SJI opposed the motion.  A hearing on the class certification motion was held in late February 2014.  On February 2, 2015, the arbitrator issued a Class Determination Award in which she certified for a class-wide hearing Claimants' disparate impact declaratory and injunctive relief class claim under Title VII, with a class period of July 22, 2004 through date of trial for the Claimants' compensation claims and December 7, 2004 through date of trial for Claimants' promotion claims.  The arbitrator otherwise denied Claimants' motion to certify a disparate treatment class

alleged under Title VII, denied a disparate impact monetary damages class alleged under Title VII, and denied an opt-out monetary damages class under the Equal Pay Act. On February 9, 2015, Claimants filed an Emergency Motion To Restrict Communications With The Certified Class And For Corrective Notice. SJI filed its opposition to Claimants' emergency motion on February 17, 2015, and a hearing was held on February 18, 2015. Claimants' motion was granted in part and denied in part in an order issued on March 16, 2015. Claimants filed a Motion for Reconsideration Regarding Title VII Claims for Disparate Treatment in Compensation on February 11, 2015. SJI filed its opposition to Claimants' Motion for Reconsideration on March 4, 2015. Claimants' reply was filed on March 16, 2015. Claimants' Motion was denied in an order issued April 27, 2015. Claimants filed Claimants' Motion for Conditional Certification of Claimants' Equal Pay Act Claims and Authorization of Notice on March 6, 2015. SJI's opposition was filed on May 1, 2015. Claimants filed their reply on June 5, 2015. Claimants' Motion was granted and the Arbitrator issued an Equal Pay Act Collective Action Conditional Certification Award and companion Order Regarding Claimants' Motion For Tolling Of EPA Limitations Period on February 29, 2016. SJI's deadline to move the US District Court for the Southern District of New York to vacate the Conditional Certification Award and Order Regarding Claimants' Motion For Tolling Of EPA Limitations Period is March 30, 2016. SJI filed with the US District Court for the Southern District of New York a Motion to Vacate the Arbitrator's Class Certification Award on March 3, 2015. Claimants' opposition was filed on March 23, 2015 and SJI's reply was filed on April 3, 2015. SJI's motion was heard on May 4, 2015. On November 16, 2015, the US District Court for the Southern District of New York granted SJI's Motion to Vacate the Arbitrator's Class Certification Award in part and denied it in part. On November 25, 2015, SJI filed a Motion to Stay the AAA Proceedings while SJI appeals the decision of the US District Court for the Southern District of New York to the United States Court of Appeals for the Second Circuit. The Motion was denied on February 22, 2016. On December 9, 2015, SJI docketed its Notice of Appeal with the United States Court of Appeals for the Second Circuit. SJI's Brief and Appendix of Appellant was filed with the United States Court of Appeals for the Second Circuit on March 17, 2016. In the AAA proceeding, on April 6, 2015, Claimants filed Claimants' Motion for Clarification or in the Alternative Motion for Stay of the Effect of the Class Certification Award as to the Individual Intentional Discrimination Claims. SJI filed its opposition on May 12, 2015. Claimants' reply was filed on May 22, 2015. Claimants' motion was granted on June 15, 2015. On February 24, 2016, the Arbitrator also issued an Order granting Claimants' motion for a stay of the Class Determination Award or for equitable tolling of the statute of limitations with respect to the putative class of Claimants alleging disparate treatment.

*     *     *

*SJI denies the allegations* of the Claimants and EEOC and has been defending these cases vigorously. At this point, no outcome or possible loss or range of losses, if any, arising from the litigation is able to be estimated.

45.     On May 26, 2016, Signet issued a press release announcing its first quarter fiscal

2017 financial results. The press release stated in pertinent part as follows:

Mark Light, Chief Executive Officer of Signet Jewelers said, "Signet delivered another period of solid performance resulting in record first quarter EPS and strong operating margin expansion. . . . Our 26% EPS growth was driven by higher same store sales and total sales along with solid expense management and

synergies, leading to 190 basis points of operating margin expansion.  In addition to delivering earnings results at the top end of our guided range, we achieved sales growth across real estate formats and in each of our divisions and our credit metrics showed strong sequential improvement.

Mr. Light added, "This Sunday marks the two-year anniversary of the close of our acquisition of Zale.  The integration continues to go extremely well across all aspects of our business.  The synergies we expect to deliver this year will be mostly driven by operating expense savings as a result of the sound investments and strategic management of the integration over the past couple of years. . . .

"I want to thank all Signet team members for their contributions to our results.  Their superior experience and dedication is the key to our ability to deliver consistently solid performance in an ever-changing environment."

46.     On August 25, 2016, Signet issued a press release announcing its second quarter

fiscal 2017 financial results, which quoted defendant Light as stating in pertinent part as follows:

"Demonstrating our confidence in our company, we repurchased nearly four percent of our outstanding common stock during the quarter coupled with purchases by our Directors and Officers.  As announced, and in a further demonstration of confidence in our company, LGP, one of the world's preeminent retail investors, agreed to purchase a $625 million stake in Signet. . . ."

Mr. Light concluded, "We have experience and success in navigating through the kind of uncertain business conditions we are seeing today.  We are confident that our organization will do so again this year. . . .  I want to thank all Signet team members for their dedication and hard work as we move in to the all-important holiday season."

47.     On November 22, 2016, Signet issued a press release announcing its third quarter

fiscal 2017 financial results.  The press release quoted defendant Light as stating in pertinent part:

"Signet achieved some important wins during the quarter.  Fashion diamond and gold jewelry performed well as did select branded bridal.  We saw success in a variety of selling channels including kiosks, outlets, and on-line.  In addition, our teams delivered solid expense and inventory management leading to strong free cash generation. The Zale integration is running well and synergies remain on target.

*       *       *

Mr. Light concluded, "Our competitive strengths, leading market position, and precedent of success support Signet's robust opportunities for long term growth.  I want to thank all Signet team members for their dedication and hard work having delivered on the third quarter while preparing effectively for the fourth quarter."

48.     In fact, contrary to defendants' flat denials of the allegations in the arbitration which

the Company made publicly in its SEC filings, press releases and other statements, in the arbitration

proceedings, defendants did not seek to "refute this evidence" alleged in the Declarations.

Moreover, the speed with which defendants denied the allegations made in the Declarations, which spanned over 1,300 pages of sworn testimony (the Declarations were submitted in June 2013 and the Company denied the allegations in August 2013 filing), infers a lack of good-faith basis for their denial.

49.     The true facts, which were known by defendants but concealed from the investing public during the Class Period, were as follows:

(a)     Mounting allegations of sexual harassment, including numerous incidents of sexual assault and rape, detailed in the Declarations made it unlikely that Signet would escape without paying sizable damages to class members;

(b)     Dozens of damning allegations of sexual harassment and misconduct by top executives at the Company, including defendant Light, made it unlikely that Signet would escape without paying sizable damages to class members;

(c)     The growth in size of claimants from the 15 claimants who originally sued in the first federal complaint to 69,000 employees who were encompassed by the class action arbitration exponentially increased the total exposure to the Company's bottom line;

(d)     Allegations implicating top executives, including defendant Light, rendered defendants' statements about Light false or misleading, along with other statements about the Company's strong management, integration successes, and ability to grow integration synergies;

(e)     Allegations of rampant sexual harassment and sexual conduct occurring all the way up to the executive level imperiled the value of the Company's brands among the consuming public, especially given the nature of the Company's "business of romance" in the engagement ring and diamond jewelry sector;

(f)     The foregoing put at risk the Company's reputation, as well as confidence in its management, and thereby increased the Company's risk profile with analysts and investors; and

(g)     Due to the foregoing, the Company was not on track to achieve the financial results that defendants had claimed it was on track to achieve during the Class Period.

50.     Moreover, pursuant to the 1934 Act and SEC Rules, Signet was required to comply with Item 303 of Regulation S-K [17 C.F.R. §229.303] in its quarterly and annual interim reports. Pursuant to Item 303 of Regulation S-K [17 C.F.R. §229.303], and the SEC's related interpretive releases thereto, issuers are required to disclose events or uncertainties, including any known trends, that have had or are reasonably likely to cause the issuers' financial information not to be indicative of future operating results.

51.     In 1989, the SEC issued an interpretive release on Item 303 and the disclosure required under the regulation. *See Management's Discussion and Analysis of Financial Condition and Results of Operations*, SEC Release No. 33-6835, 1989 SEC LEXIS 1011 (May 18, 1989) (hereinafter referred to as the "1989 Interpretive Release"). In the 1989 Interpretive Release, the SEC stated that:

> Required disclosure is based on currently known trends, events, and uncertainties that are reasonably expected to have material effects, such as: A reduction in the registrant's product prices; erosion in the registrant's market share; changes in insurance coverage; or the likely non-renewal of a material contract.
>
> *          *          *
>
> A disclosure duty exists where a trend, demand, commitment, event or uncertainty is both presently known to management and reasonably likely to have material effects on the registrant's financial condition or results of operation.

*Id*. at *12-*13.

52.     Furthermore, the 1989 Interpretive Release provided the following test to determine if disclosure under Item 303(a) is required:

> Where a trend, demand, commitment, event or uncertainty is known, management must make two assessments:
>
> (1)     Is the known trend, demand, commitment, event or uncertainty likely to come to fruition? If management determines that it is not reasonably likely to occur, no disclosure is required.

> (2)    If management cannot make that determination, it must evaluate objectively the consequences of the known trend, demand, commitment, event or uncertainty, on the assumption that it will come to fruition.  Disclosure is then required unless management determines that a material effect on the registrant's financial condition or results is not reasonably likely to occur.

*Id.* at *19.

53.    Throughout the Class Period, Signet's business was experiencing negative trends and uncertainties that were likely to materially impact its continuing operations and future results, in that the mounting pile of damning evidence in the arbitration proceedings, coupled with the size of the putative class growing to an estimated 69,000, made it more likely than not that the Company would be forced to pay a substantial damage award in the arbitration proceedings.  This growing adverse trend was material to investors' understanding of the Company's profitability because it was taking no reserves against earnings for tens of millions of dollars (if not more) in potential legal liability. While the Company may not have known to a moral certainty the full extent of damages it faced, aided by its lawyers, the Company was able to estimate at least a range of potential damages and disclose that range.  But the Company failed to do so.  As such, the Company's interim financial reports should have disclosed these known trends and uncertainties, and its failure to do so rendered its statements false or misleading, or at the very least, a material omission.

54.    Moreover, each time the Company stated during the Class Period that "SJI denies the allegations" in the arbitration proceedings and that, "[a]t this point, no outcome or possible loss or range of losses, if any, arising from the litigation is able to be estimated," the Company implied that its legal and accounting experts had advised, based on their expertise, the evidence presented and the size of the putative class, that Signet did not face a material amount of legal liability and had no duty to take a reserve.

**THE TRUTH BEGINS TO BE REVEALED TO THE INVESTING PUBLIC**

55.     After trading closed on February 27, 2017, *The Washington Post* published the Report entitled "Hundreds allege sex harassment, discrimination at Kay and Jared jewelry company," which stated in pertinent part as follows:

> Hundreds of former employees of Sterling Jewelers, the multibillion-dollar conglomerate behind Jared the Galleria of Jewelry and Kay Jewelers, claim that its chief executive and other company leaders presided over a corporate culture that fostered rampant sexual harassment and discrimination, according to arbitration documents obtained by The Washington Post.

> Declarations from roughly 250 women and men who worked at Sterling, filed as part of a private class-action arbitration case, allege that female employees at the company throughout the late 1990s and 2000s were routinely groped, demeaned and urged to sexually cater to their bosses to stay employed.  Sterling disputes the allegations.

> The arbitration was first filed in 2008 by more than a dozen women who accused the company of widespread gender discrimination.  The class-action case, still unresolved, now includes 69,000 women who are current and former employees of Sterling, which operates about 1,500 stores across the country.

> Most of the sworn statements were written years ago, but the employees' attorneys were only granted permission to release them publicly Sunday evening.  One of the original women who brought the case, those lawyers said, died in 2014 as proceedings crawled on without resolution.

> The statements allege that top male managers, some at the company's headquarters near Akron, Ohio, dispatched scouting parties to stores to find female employees they wanted to sleep with, laughed about women's bodies in the workplace, and pushed female subordinates into sex by pledging better jobs, higher pay or protection from punishment.

> Though women made up a large part of Sterling's sales force, many said they felt they had little recourse with their mostly male management.  Sanya Douglas, a Kay sales associate and manager in New York between 2003 and 2008, said a manager even had a saying for male leaders coaxing women into sexual favors to advance their careers, calling it "going to the big stage."

> "If you didn't do what he wanted with him," she said in the 2012 sworn statement, "you wouldn't get your (preferred) store or raise."

> *        *        *

> The former and current employees are seeking punitive damages and years of back pay, though no estimate of the potential damages has been given.  A class hearing, during which witnesses will be called to testify before the arbitration judge for the first time, is scheduled for early next year.

> Sterling, like other U.S. companies, requires all workers to waive their right to bring any employment-related disputes against their employer in public courts.

Instead, complaints must be decided in arbitration – a private, quasi-legal system where cases are guaranteed little transparency.

Since 2015, The Post has requested to review the employee statements submitted as part of arbitration, all of which were designated as confidential. Employees' attorneys have also sought to make them publicly available. Attorneys for the employees and the company recently reached an agreement that the documents could be made public on the condition that they not identify any of the individuals to whom conduct was attributed.

More than 1,300 pages of sworn statements were released Sunday and feature company-approved redactions that obscure the names of managers and executives accused of harassment or abuse. But a memorandum by the employees' attorneys supporting their motion for class certification, filed in 2013, revealed that top executives including Mark Light, now chief executive of Sterling's parent company, Signet Jewelers, were among those accused of having sex with female employees and promoting women based upon how they responded to sexual demands.

Light did not respond to requests for comment, and the company did not make him available for an interview. The company declined to address detailed questions about the allegations made by former employees against Light and other managers.

Many of the most striking allegations stem from the company's annual managers meetings, which former employees described as a boozy, no-spouses-allowed "sex-fest" where attendance was mandatory and women were aggressively pursued, grabbed and harassed.

Multiple witnesses told attorneys that they saw Light "being entertained" as he watched and joined nude and partially undressed female employees in a swimming pool, according to the 2013 memorandum.

Routine sexual "preying" at company events "was done out in the open and appeared to be encouraged, or at least condoned, by the company," Melissa Corey, a manager of Sterling stores in Massachusetts and Florida between 2002 and 2008, said in her declaration.

Ellen Contaldi, a Sterling manager in Massachusetts between 1994 and 2008, said in her declaration that male executives "prowled around the (resort) like dogs that were let out of their cage and there was no one to protect the female managers from them."

"I didn't like being alone, anywhere. I used to dread going" to the meetings, Contaldi told The Post in an interview. "If you were even remotely attractive or outgoing, which most salespeople are, you were meat, being shopped."

"It was like nobody knew right from wrong, and there was nobody trying to show anybody right from wrong," Contaldi added. "There was no discipline. There was no consequence. You were on your own."

Former employees who sought help or reported abuse through an internal hotline alleged in their declarations that they were verbally attacked or terminated. Kristin Henry, a five-year Sterling employee who said she was 22 when an older district manager tried to kiss and touch her at a managers event, told The Post she was falsely accused of theft and quickly fired after reporting his advances to superiors at Sterling.

- 21 -

The case, *Jock et al. v. Sterling Jewelers*, was filed before the American Arbitration Association, one of the nation's largest arbitration organizations. Kathleen A. Roberts, the case's arbitrator and a retired federal magistrate, is forbidden by association rules from speaking with the media. Like other arbitrations, the case before Roberts is conducted in private and is legally binding. While arbitrator decisions are appealable, there are very limited grounds on which decisions can be overturned. The confidential nature of the case has made it difficult to determine why it has taken so long to resolve.

In a 2015 decision to grant class-action status to the women, Roberts wrote that the testimony includes references to "soliciting sexual relations with women (sometimes as a quid pro quo for employment benefits), and creating an environment at often-mandatory Company events in which women are expected to undress publicly, accede to sexual overtures and refrain from complaining about the treatment to which they have been subjected."

"For the most part Sterling has not sought to refute this evidence," Roberts wrote. Instead, she wrote, "Sterling argues that it is inadmissible, irrelevant and insufficient to establish a corporate culture that demeans women."

The case could deeply tarnish a business that sells billions of dollars worth of jewelry a year through romance-centered marketing campaigns such as "Every Kiss Begins with Kay." Signet told shareholders in an annual report last year that it would have to "pay substantial damages" if it lost the case.

Sterling's mall outlets and storefronts account for a large chunk of America's jewelry market, as well as more than 18,000 jobs across all 50 states. Its parent company, Signet, which is domiciled in Bermuda but headquartered in Ohio, is the world's largest retailer of diamond jewelry, selling more than $6 billion of jewelry, watches and services in 2015, company filings show.

\*     \*     \*

Men who are not part of the class also filed sworn statements alleging Sterling was a hostile workplace for women. Richard Sumen, who worked for Sterling in Ohio from 1992 until 2005, said in his declaration that a group of managers and officers commonly known as the "good ole boys" was infamous for "protecting and promoting their friends, and wild escapades of sex, drugs, excessive drinking and womanizing." He recalled one former Ohio-based executive saying, "Why pay women more when they just get pregnant and have families?"

\*     \*     \*

Sumen told The Post that he remained troubled by what he called Sterling's discriminatory corporate climate. He wrote in his 2008 declaration, "This culture of sexism and womanizing was so prevalent that female management employees were pressured to acquiesce and participate."

### Like 'an abusive relationship'

This culture seemingly arose in a company whose sales force was mostly women. More than 68 percent of Sterling's store managers are women, the company told The Post. Three of Signet's 10 executive officers are women. A job-recruitment video calls Sterling "your place to shine" and promises an "exciting and fulfilling career."

Light was made Sterling's chief executive in 2006 and presided over an eight-year growth streak during which the company's sales more than tripled.  Light, now 54 and chief executive of Signet, earned about $7.4 million in salary, stock and bonuses in fiscal 2016, up from $2.4 million in 2014, company filings show.

\*         \*         \*

The Equal Employment Opportunity Commission said in a report last year that mandatory arbitration policies "can prevent employees from learning about similar concerns shared by others in their workplace."

56.     On February 28, 2017, following the Report and other similar media stories, the Company issued a statement attempting to minimize the bombshell revelations.  In doing so, however, the Company admitted that the arbitration encompassed 69,000 class members and involved millions of pages of documentation.

57.     As a result of this news, the price of Signet common stock plummeted $9.29 per share to close at $63.59 on February 28, 2017, a decline of nearly 13% on volume of 11.3 million shares, or 11 times the average daily trading volume over the preceding 10 trading days.

58.     Following the revelations in the Report, on March 1, 2017, the Telsey Advisory Group downgraded Signet stock to "Market Perform from Outperform" due in part to the "potential fallout from yesterday's reported allegations of gender discrimination," which carried the "potential for further earnings risk."  Based on this and other risk factors, Telsey took down its "*FY18 EPS estimate to $7.75 from $8.20*."  (Emphasis in original.)  In addition, on March 5th and 7th, respectively, Goldman Sachs and Citigroup lowered their price targets for Signet stock.

59.     On March 7, 2017, the *Financial Times* issued a report entitled "Signet Jewelers is S&P 500's worst performer so far this year."  According to the report, Signet's stock drop of nearly 13% on February 28, 2017, was "its biggest one-day drop in 8 years – after the Washington Post reported that former employees of Sterling Jewelers filed a private class-action arbitration case alleging discrimination, among other claims."

60.     On March 9, 2017, the Company announced new business reforms in the wake of the Report.  Signet's Chairman, Todd Stitzer, who characterized himself as "a bridge" between

shareholders and management, opened the Company's fourth quarter and fiscal 2017 earnings call by addressing "many of the questions we've heard from you during and following the media attention focused on the Company last week" about the arbitration.  While still downplaying the evidence, Stitzer announced that the Company was taking corrective actions "to assure ourselves, our shareholders and our team members that our policies and practices are functioning as intended and to identify areas where we can further improve."  Specifically, Stitzer announced that the Board of Directors would form "new committee focused on respect in the workplace," comprised of female directors.  That new committee, according to the earnings call, will appoint an independent consultant to conduct a thorough review of the Company's policies and practices, including "non harassment training and reporting, investigation and non-retaliation."  Stitzer said that the committee also plans to appoint an independence ombudsman "to act as an informal third party avenue to provide confidential advice to employees, to address concerns regarding the issues and the workplace and to provide options and strategies to assist them in the resolution of workplace concerns."  Finally, Stitzer admitted, in response to questions about management's fitness, that the Board was aware of the allegations against Light when he was appointed COO and later appointed CEO after defendant Barnes departed.

61.     As a result of defendants' false or misleading statements, Signet common stock traded at artificially inflated prices during the Class Period.  However, after the above revelations seeped into the market, the price of the Company's common stock dropped 58% from its Class Period high, causing economic harm and damages to class members.

## LOSS CAUSATION/ECONOMIC LOSS

62.     During the Class Period, defendants made false or misleading statements by concealing evidence of rampant sexual assault and harassment across the country, including evidence related to its executives engaging in such conduct at official Company functions, and, in

doing so, defendants engaged in a scheme to deceive the market. Defendants' conduct artificially

inflated the price of Signet common stock and operated as a fraud or deceit on the Class. Later,

when the truth was disclosed to market participants, the price of Signet common stock quickly

dropped, as the prior artificial inflation came out of the price as a result of the fraud coming to light,

the increased risk profile, anticipated liability, operational costs, and/or reputational losses. As a

result of their purchases of Signet common stock during the Class Period, plaintiff and members of

the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## APPLICABILITY OF PRESUMPTION OF RELIANCE

63.     Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-

market doctrine in that, among other things:

(a)     Defendants made public misrepresentations or failed to disclose material facts

during the Class Period;

(b)     The omissions and misrepresentations were material;

(c)     The Company's stock traded in an efficient market;

(d)     The misrepresentations and omissions alleged would tend to induce a

reasonable investor to misjudge the value of the Company's stock; and

(e)     Plaintiff and other members of the Class purchased Signet common stock

between the time defendants misrepresented or failed to disclose material facts and the time the true

facts were disclosed, without knowledge of the misrepresented or omitted facts.

64.     At all relevant times, the market for Signet stock was efficient for the following

reasons, among others:

(a)     Signet stock met the requirements for listing, and was listed and actively

traded on the NASDAQ, an efficient market;

(b)     As a regulated issuer, Signet filed periodic public reports with the SEC; and

(c)     Signet regularly communicated with public investors via established market communication mechanisms, including through the regular dissemination of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services.

## NO SAFE HARBOR

65.     Defendants' false or misleading statements during the Class Period were not forward-looking statements ("FLS") or were not identified as such by defendants, and thus did not fall within any "Safe Harbor."

66.     Signet's verbal "Safe Harbor" warnings accompanying its oral FLS issued during the Class Period were ineffective to shield those statements from liability.

67.     Defendants are also liable for any false or misleading FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized and/or approved by an executive officer of Signet who knew that the FLS was false. Further, none of the historic or present tense statements made by defendants were assumptions underlying or relating to any plan, projection or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made.

## CLASS ACTION ALLEGATIONS

68.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased Signet common stock during the Class Period (the "Class").[3]   Excluded from the Class are defendants and their immediate families, directors and officers of Signet and their immediate families, and their legal representatives, heirs, successors or assigns, and any entity in which defendants have or had a controlling interest.

---

[3]     Plaintiff reserves the right to amend the Class definition or Class Period.

69.     The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  During the Class Period, Signet had nearly 70 million shares of stock outstanding, owned by hundreds or thousands of persons.

70.     There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class that predominate over questions that may affect individual Class members include:

(a)     Whether the 1934 Act was violated by defendants;

(b)     Whether defendants omitted or misrepresented material facts;

(c)     Whether defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)     Whether defendants knew or recklessly disregarded that their statements were false or misleading;

(e)     Whether the price of Signet common stock was artificially inflated; and

(f)     The extent of damage sustained by Class members and the appropriate measure of damages.

71.     Plaintiff's claims are typical of those of the Class because plaintiff and the Class sustained damages from defendants' wrongful conduct.

72.     Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation.  Plaintiff has no interest which conflicts with those of the Class.

73.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## COUNT I

### For Violation of §10(b) of the 1934 Act and Rule 10b-5
### Against All Defendants

74.     Plaintiff incorporates ¶¶1-73 by reference.

75.     During the Class Period, defendants disseminated or approved the false or misleading statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

76.     Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a)     Employed devices, schemes and artifices to defraud;

(b)     Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)     Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Signet common stock during the Class Period.

77.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Signet common stock.  Plaintiff and the Class would not have purchased Signet common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

78.     As a direct and proximate result of these defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their purchases of Signet common stock during the Class Period.

## COUNT II

### For Violation of §20(a) of the 1934
### Act Against All Defendants

79.     Plaintiff incorporates ¶¶1-78 by reference.

80.     During the Class Period, defendants acted as controlling persons of Signet within the

meaning of §20(a) of the 1934 Act.  By virtue of their positions and their power to control public

statements about Signet, the Individual Defendants had the power and ability to control the actions

of Signet and its employees.  Signet controlled the Individual Defendants and its other officers and

employees.  By reason of such conduct, defendants are liable pursuant to §20(a) of the 1934 Act.

### PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for judgment as follows:

A.     Determining that this action is a proper class action, designating plaintiff as Lead

Plaintiff and certifying plaintiff as class representative under Rule 23 of the Federal Rules of Civil

Procedure and plaintiff's counsel as Lead Counsel;

B.     Awarding plaintiff and the members of the Class damages and interest;

C.     Awarding plaintiff's reasonable costs, including attorneys' fees; and

D.     Awarding such equitable/injunctive or other relief as the Court may deem just and

proper.

### JURY DEMAND

Plaintiff demands a trial by jury.

DATED:  March 28, 2017                KENDALL LAW GROUP, PLLC
                                      JOE KENDALL (Texas Bar No. 11260700)
                                      JAMIE J. McKEY (Texas Bar No. 24045262)

                                      *Joe Kendall*
                                      _____
                                      JOE KENDALL

- 29 -

3232 McKinney Avenue, Suite 700
Dallas, TX  75204
Telephone:  214/744-3000
214/744-3015 (fax)
jkendall@kendalllawgroup.com
imckev@kendalllawgroup.com

ROBBINS GELLER RUDMAN
   & DOWD LLP
DAVID C. WALTON
SPENCER A. BURKHOLZ
RACHEL L. JENSEN
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone: 619/231-1058
619/231-7423 (fax)
davew@rgrdlaw.com
sburkholz@rgrdlaw.com
rachelj@rgrdlaw.com

Attorneys for Plaintiff